IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


MARYLAND STATE CONFERENCE          :
  OF NAACP BRANCHES, ET AL.


                                   :
    vs.                                     CIVIL ACTION NO. JKB-98-1098
                                   :


MARYLAND STATE POLICE, ET AL.    :


---

**MEMORANDUM AND ORDER ADDRESSING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

## <u>MEMORANDUM TABLE OF CONTENTS</u>

I. BACKGROUND.................................P.3

II. STANDARD OF REVIEW........................P.3

III. ANALYSIS

      A. TITLE VI..............................P.4

      B. SUPERVISORY CLAIMS....................P.11

      C. DAMAGES...............................P.13

      D. STANDING..............................P.14

      E. INDIVIDUAL STOPS/SEARCHES.............P.15

            1. THE RODWELL STOP.................P.17

            2. THE BAILEY STOP..................P.25

            3. THE WILLIAMS STOP................P.29

            4. THE BERRY STOP...................P.32

            5. THE TAYLOR STOP..................P.34

            6. THE JEFFRIES-MEANS STOP..........P.37

      F. CONCLUSION............................P.39

## MEMORANDUM

Pending and ready for disposition is defendants' motion for summary judgment (Paper No. 226).   The motion has been fully briefed, and no hearing is necessary.   Local Rule 105.6.   For the reasons set forth below, the motion for summary judgment will be granted in part and denied in part by separate Order.

### I. Background

This action asserts claims of the plaintiffs that they were subjected to illegal traffic stops and/or searches by Maryland state troopers.   At its heart, the action asserts that the stops and searches were the result of racial profiling and were otherwise legally infirm in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, Article 24 of the Maryland Declaration of Rights and Title VI of the Civil Rights Act of 1964.   Monetary damages are sought from the Maryland State Police pursuant to Title VI and from individual troopers and some of their supervisors pursuant to the constitutional claims.[1]

### II. Standard of Review

Generally, an award of summary judgment is proper in federal cases when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving

---

[1]All claims against 15 defendants and some claims against others were abandoned subsequent to the filing of the instant motion.

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)(overruled on other grounds).

### III. *Analysis*

### A. *Title VI*

There is agreement between the parties that the plaintiffs, in order to prevail on their Title VI monetary claims against the Maryland State Police, must show a *de facto* policy of intentional race discrimination at the organizational level. There is no direct evidence of such a policy, or even of a neutral policy that might have created a racially disparate impact. To the contrary, the written policy in place during the pertinent period is embodied in General Order 01-9503 issued January 1, 1995, by the Superintendent of the Maryland State Police. That document provides *inter alia* that race will not be utilized as a consideration in determining whether to make a traffic stop or search. (Defense Exhib. Bates No. 04985-86). In sum, the

plaintiffs ultimately must show that the senior officer corps of the agency had an unwritten policy in derogation of the written policy.

The parties engage in substantial sparring over whether it is sufficient for the plaintiffs, in avoidance of summary judgment on the Title VI claims, to make a showing that the senior officer corps had actual knowledge that racially discriminatory conduct was afoot and that they were deliberately indifferent to that conduct. The defendants, leaning ever so heavily upon their interpretation of a footnote in *Peters v. Jenney*, 327 F.3d 315 (4th Cir. 2003), posit that a showing of deliberate indifference by the administration to discriminatory conduct is insufficient to establish intentional discrimination in the context of Title VI. The Court finds it unnecessary to resolve this difference and will assume, for the purposes of this discussion only, that it is sufficient for the plaintiffs to make a showing that the administration was deliberately indifferent to discriminatory conduct of which they had actual knowledge.[2]

---

[2]The term "deliberate indifference", in the context of supervisory liability for the constitutional torts of subordinates, "entails something more than mere negligence" but "something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The Supreme Court noted that there is one class of prison cases--excessive force-- in which the deliberate indifference standard is inappropriate.
(continued...)

The plaintiffs set forth a body of evidence that, they argue, establishes actual knowledge among the senior officer corps of discriminatory conduct.   Specifically, the plaintiffs point to several memoranda prepared and distributed by senior officers, along with statistical analysis prepared by the department (Plaintiffs' Opposition to Motion for Summary Judgment, pp. 6-13). Those documents, however, offer significantly more than evidence of actual knowledge of discriminatory conduct, but what they reveal most certainly does not weigh in favor of the plaintiffs.

A memorandum from Lt. Col. Harvey to Region and Division Commanders states:

> Pursuant to the settlement of a federal lawsuit, General Order No. 01-9503, dated January 1, 1995, was disseminated.   The Order stated that the Maryland State Police would not use any form of race-based drug courier profiles.
>
> After having the opportunity to review statistics gathered from January 1, 1995 through June 1, 1995 pertaining to these searches, the numbers reveal that Troopers are continuing to target non-white subjects.   I have attached a copy of the summary for your information so that you can see the trends.
>
> It is imperative that you reinforce with your

---

[2](...continued)
The plaintiff in such cases must show more than indifference, deliberate or otherwise.   Instead, the required showing is that officials applied force "maliciously and sadistically, for the very purpose of causing harm." *Id*.   The essence of the defense argument in this case, similarly, is that deliberate indifference is an inappropriate standard for proof of intentional discrimination in the context of a Title VI monetary claim.

respective commanders that no profiles are to be used. This information, as a result of the lawsuit, is ultimately distributed to the ACLU, and the Department, Commanders, and Troopers may be held accountable and open to potential litigation.

This information should be explained and reiterated to each individual under your command.  Kindly have them review this memorandum and forward to my office, no later than July 10, 1995, a signed Form 42 indicating receipt and acknowledgement [sic] of this information.

(Plaintiffs' Exhib. 4).

A memorandum from Maj. Hall to Lt. Col. Leatherbury regarding the stop and search statistics from the drug interdiction program includes the following:

Statistics recorded in association with the Drug Interdiction Program suggest certain personnel may have lost focus as to the intent of the overall concept of drug interdiction as described in policy and procedures developed to administer these activities, i.e., General Order Number 012-9305 establishes that it is the policy of the Department of the Maryland State Police that any assemblage of general characteristics of persons engaged in drug courier activity shall not include or imply the race of any person as one of those characteristics. <u>Race is not a predictor of criminal activity.</u>  Race legally cannot and will not be a factor for the development of policies for stopping, detaining or searching motorists on Maryland roadways.

(Defense Exhib. Bates No. 05546)(Emphasis in original).

A subsequent memorandum from Maj. Hall to the Lt. Betkey, commander of the JFK Barrack, reads:

Continuing to monitor the drug interdiction activities at the JFK Barrack (09/08/96 thru 10/05/96) finds that little to no change has occurred.  The figures for the proportion of Caucasian to African American violators remains pretty much the same as in my previous analysis communicated to you on or about September 9,

7

1996.  In this last period analysis the proportion of Caucasians and African Americans subjected to the Form 130 Process is the same.

Keeping in mind the logic used to analyze this data by the ACLU, there exists the potential for allegations of race based profiling in that the proportion of the violating public is not in line with those involved in the Form 130 process.

A second analysis was conducted to determine the impact this last reporting period has on the study begun in June of 1996 (06/16/96 thru 10/05/96).  The resulting figures remain remarkably unchanged.  The violating public consists of 64% Caucasian and 31% African American, while the Form 130 process breaks down to 36% Caucasian and 50% African American.  The proportions continue to be reversed.

I understand that the actual numbers represented by these percentages are small, the result of any number of manpower issues that the Barrack has faced in the recent past; however the proportional aspects and the inference that can be drawn must be addressed.

Also of concern is the lack of performance of the STIF[3] Team personnel.  There is no easy way to say what is apparent, these personnel, the demonstrated leaders in this area, have stopped working drug interdiction.  All requests for guidance, support and re-assurance from the Superintendent and the Attorney General, as well as, local command have been provided, they did not fulfill their part of the bargain [sic].

It is understood that the recent turn of events concerning manpower has resulted in these individuals being placed into leave groups and that recent assignments may have diverted them from actual road patrol, however, this does not account for the REMARKABLE reduction in their personal performance.  This is something they did and not management.

By this memo, I am directing that appropriate steps

---

[3]Special Traffic Interdiction Enforcement

be taken to address the performance issues of these
individuals, as well as to ensure that those individuals
that continue to perform do so consistent with and in
support of the Department's stated position that its law
enforcement responsibilities are performed/provided in a
fair and equitable manner.  To this end, please provide
me with documentation concerning your plan of action by
November 1, 1996

Please advise me if I can be of assistance.

(Plaintiffs' Exhib. 10) (Emphasis in original).

Yet another memorandum from Maj. Hall, this to Lt. Col

Graybill, chief of the Field Operations Bureau, contained the

following:

. . . The personnel assigned to the JFK Barrack are
fully aware of the severe consequences associated with
being found to be using race as a precursor for stopping
and/or searching vehicles, or for that matter any other
application of their law enforcement authority.  These
activities have been and continue to be closely
supervised at each level of command in order to ensure
that enforcement activities are objective and impartial.

(Plaintiffs' Exhib. 13).

As noted above, the plaintiffs rely on the above-referenced

exhibits, among others, in support of the proposition that, at

least arguably, the senior officer corps was aware of statistical

evidence of discriminatory conduct by troopers on the line.  More

saliently, however, the exhibits provide extremely powerful

evidence of an ongoing concern among the senior officer corps in

regard to the policy against such conduct and ongoing efforts

toward remediation, some of which appears, at least in the eyes of

9

some supervisors, to have been met with some resistance by those troopers.

These exhibits, coupled with lengthy affidavits from Col. Mitchell (Defense Exhib. Bates No. 05115-05123), Lt. Col. Leatherbury (Defense Exhib. Bates No. 05124-05127) and Lt. Gray (Defense Exhib. Bates No. 05128-05131) setting forth the actions taken in furtherance of written policy against racial profiling in traffic stops and searches, comprise a compelling body of evidence antithetical to a finding of deliberate indifference on the part of the senior officer corps.

The plaintiffs, on the other hand, offer only rhetoric on this point, arguing that the evidence "creates a substantial dispute . . . as to whether the MSP and the supervisory defendants took sufficient steps to combat the racial profiles their subordinates were implementing." (Plaintiffs' Opposition to Motion for Summary Judgment, p. 91). Even that rhetoric is misplaced, however, inasmuch as a showing that the efforts of the administration were "insufficient" to remedy the purported conduct falls well short of the bar that the plaintiffs set for themselves, *i.e.,* the establishment of a *prima facie* case that the administration was deliberately indifferent to discriminatory conduct of the troopers on the line. The plaintiffs cite to *Davis v. Monroe County Bd. Of Ed.,* 526 U.S. 629, 648 (1999), in support of the proposition that

10

a colorable claim of deliberate indifference must contain facts that would support a conclusion that the response of the senior officer corps in this case was clearly unreasonable in light of the known circumstances.   There is no such colorable claim in this case.   By separate Order, summary judgment will be awarded to Defendant Maryland State Police on all Title VI claims brought against it by the plaintiffs.

### B. *Supervisory Claims*

Claims of supervisory liability for the actions of individual troopers remain against Col. David B. Mitchell, Maj. George H. Hall and Lt. Vernon Betkey.   During the pertinent period, Col. Mitchell was superintendent of the agency and Maj. Hall was commander of the northern division.   However, Lt. Betkey was commander of the JFK Barrack only from November 22, 1995, until January 1, 1997.   The claims of Plaintiffs Eric Anthony and George Taylor relate to a traffic stop alleged to have occurred in September 1995.   The claims of Plaintiff Cy I relate to a traffic stop alleged to have occurred in April 1995.   The claims of Plaintiff Verna A. Bailey relate to a traffic stop that occurred on November 9, 1995.   The claims of Plaintiffs John S. Means and Kenneth R. Jeffries relate to a traffic stop that occurred on October 9, 1995.   The claims of Plaintiffs Yancey and Aleisha Taylor relate to a traffic stop that occurred on October 26, 1995.   The claims of Johnston E. Williams

11

relate to a traffic stop that occurred on August 4, 1997.  In sum, all of the above-referenced supervisory claims against Lt. Vernon Betkey relate to traffic stops that occurred at times that Lt. Betkey was not commander of the JFK Barrack and not the supervisor of the troopers making the stops.  Accordingly, an order will be entered separately awarding summary judgment in favor of Lt. Betkey as to those claims.

The parties set forth the standard under which these supervisory officials may he held liable for constitutional injuries inflicted by their subordinates, which standard includes a finding that the supervisor's response to unconstitutional conduct of which he was aware "was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged practices . . ."  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)(citations omitted).

The analysis of the supervisory claims and the facts pertinent thereto, then, does not differ materially from the analysis set forth above in regard to the Title VI claims.  Again, that analysis is fatal to plaintiffs' claims insofar as the conduct of Col. Mitchell and Maj. Hall is concerned.  Accordingly, an order will be entered separately awarding summary judgment to Defendants Mitchell and Hall as to all claims of supervisory liability.

That is not the case in regard to Lt. Betkey, who was the

supervisor at the JFK Barrack at the time of the stops of Gary
Rodwell and William Bailey.  As previously noted, there is
compelling evidence of substantial concern and activity flowing
downward in the chain of command to Lt. Betkey, but there is no
indication in the record that the concern went beyond him.  In
other words, it has not been shown that Lt. Betkey did not exhibit
"deliberate indifference" to the concerns articulated by his
superiors and "tacit authorization" to the purported conduct of the
troopers under his supervision.  Accordingly, summary judgment will
be denied to Lt. Betkey in regard to the claims of supervisory
liability for the Rodwell and Berry stops.[4]

### C.  Damages

Defendants urge the Court to find as a matter of law that the
plaintiffs are entitled to no compensatory damages.  Their argument
is singularly unconvincing.  The authorities upon which defendants
rely were cases analyzing the sufficiency of trial testimony to
support awards of compensatory damages for emotional distress
resulting from constitutional violations.  The cases do not support
truncation of that issue at the summary judgment stage.  In *Price
v. City of Charlotte, North Carolina*, 93 F.3d 1241 (4th Cir. 1996),

---

[4]Any liability of Lt. Betkey here derives in part from the
conduct of the troopers under his supervision.  Therefore, on any
claim where those troopers gain summary judgment, so too does Lt.
Betkey. (*See,* Parts III.E. 1. and 4., *infra*).

the Court endorsed the consideration of a variety of factors in the analysis of such a claim, including loss of esteem among one's peers, physical injury, need for counseling, loss of income, the context of the events surrounding the distress, corroborating evidence and forced change in conduct.  The Court notes this to be a particularly fact-intensive inquiry, the type of which is ill-suited to disposition by summary judgment.  Moreover, damages for intangible harms are subjective and depend, in part, on the demeanor of the witness.  *See, Pathways Psychosocial v. Town of Leonardtown, MD*, 223 F. Supp. 2d 699 (D. Md. 2002).  The Court will deny defendants' motion on this issue.

### D.   NAACP "Standing"

Defendants contend that the Maryland State Conference of NAACP Branches does not have standing to bring claims for monetary damages.  That contention, which appears to be meritorious and which defendants support with substantial authority, has gone unaddressed in plaintiffs' response.  The motion will be granted by separate Order, and summary judgment will be awarded in favor of the defendants as to the issue of whether the organizational plaintiff may bring claims for monetary damages.  In the event that the failure to address the issue was inadvertent, the plaintiff may seek a cure through a motion for reconsideration.

### E.   *Individual Stops/Searches*

The Court has reviewed carefully the claims of plaintiffs Gary Rodwell (stopped January 17, 1996), Verna Bailey (stopped November 9, 1995), Johnston Williams (stopped August 14, 1997), William Berry (stopped May 2, 1996), Yancey and Aleshia Taylor (stopped October 26, 1995) and Kenneth Jeffries and John Means (stopped October 9, 1995).

The troopers involved in these stops contend *inter alia* that they are protected by qualified immunity from liability for their conduct.  "A court required to rule upon the qualified immunity issue must consider . . . this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the

burden of trial if qualified immunity is applicable." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Plaintiffs allege violation of Fourth Amendment rights to freedom from unreasonable search and seizure and Fourteenth Amendment rights to freedom from race discrimination. Specifically, plaintiffs allege that they were stopped and/or their vehicles were searched for no good reason (Fourth Amendment) and for an impermissible reason (Fourteenth Amendment). The temporary detention of individuals during the stop of an automobile by police, if only for a brief period and for a limited purpose, is a seizure within the contemplation of the Fourth Amendment and such stops must not be unreasonable under their circumstances. *Whren v. United States,* 517 U.S. 806, 809-810 (1996). Likewise, warrantless automobile searches in the context of this case violate the Fourth Amendment unless they are supported by probable cause or performed pursuant to uncoerced consent. *See, Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). Stops and searches based on such considerations as race, on the other hand, are precluded by the Equal Protection Clause of the 14th Amendment. *Whren,* at 813. So, there is no question that there are constitutional rights at stake in this

16

case, at least insofar as plaintiffs' general allegations are concerned.   To reiterate, the inquiry prescribed in *Saucier* requires, first, an examination of whether the facts alleged by the complainant show conduct that violated a constitutional right and, second, whether the right was clearly established, *i.e.* would it be clear to a reasonable officer that his conduct was unlawful. Whether the facts alleged show violations of plaintiffs' Fourth Amendment and Fourteenth Amendment rights--the first prong of the inquiry prescribed by *Saucier*--is a question that requires examination of each stop.   Necessarily, then, the issue of qualified immunity will be examined along with the substantive constitutional claims against the individual defendants on a "stop-by-stop" basis.

### 1.   The Rodwell Stop

Plaintiff Gary Rodwell was stopped by Trooper David Hughes. Troopers Bernard Donovan and John Appleby also were present during part of the stop.

Plaintiff Rodwell avers that when he was pulled over he was traveling at approximately 70 miles per hour southbound on Interstate 95.   He states that he was in the middle lane of traffic, driving at the same speed as the vehicles visible to him, on cruise control.   Plaintiff Rodwell says that as he was handing Trooper Hughes his license and registration he asked if he had been

speeding and that Trooper Hughes responded, "No, not really" (or words to that effect).  He claims that Trooper Hughes then asked whether he had any drugs or firearms in the car and when he replied that he did not Trooper Hughes stated that if that was true he would not mind if the trooper searched his car.   Trooper Hughes purportedly said that he just wanted to confirm that plaintiff Rodwell did not have drugs or firearms in the car.   (Rodwell Responses to Hughes Interrogatories No. 5, 8).

Plaintiff Rodwell avers that when he refused to consent to the search Trooper Hughes took his license and registration back to his cruiser and, after running a check, returned to inform him that his registration had been suspended, apparently for an emissions violation.   He claims that Trooper Hughes then asked again for permission to search the car.  He was then told to step out of his car and take a seat in the front seat of the police cruiser. Plaintiff Rodwell claims that an extended conversation took place in the cruiser during which Trooper Hughes said that he was trained in these matters and that Plaintiff Rodwell looked to him like the type of person who would be carrying drugs.  Plaintiff Rodwell says he told Trooper Hughes that it was his right to decline a search, to which Trooper Hughes purportedly replied that it was his right to lock him up.  (Rodwell Responses to Hughes Interrogatories, No. 12).

18

"Trooper Hughes said that I looked nervous.  I told the trooper that I was indeed nervous, not because I had done anything wrong, but because I was in a strange place at night with an officer who had just implied that he was going to lock me up. Surprisingly, Trooper Hughes replied that he was the one who should be nervous.  The trooper patted his revolver and said that I could have tried to take his gun away from him during our conversation. I was insulted by the trooper's comment, and was shocked that the trooper would even infer such an action on my behalf.  I told Trooper Hughes that such behavior never crossed my mind.  The trooper then said something like, 'why, are you afraid that I would take you to the side of the road and beat you?'"  *Id.*

Plaintiff Rodwell claims that the trooper attempted several times during the conversation to get him to sign a consent-to-search form and said that if he would not consent he would call for a canine unit, which, he said, would be very time consuming. Trooper Hughes purportedly said that he would be very angry with Plaintiff Rodwell if he had to do a canine search of the car when he didn't have any contraband in it because it would be a waste of his time.  Id.

Plaintiff Rodwell claims that about half an hour later two troopers arrived with a dog.  The dog was walked around the car, he said, and then Trooper Hughes rushed back to the cruiser, accused

Plaintiff Rodwell of lying and said that the dog had alerted. (Rodwell Responses to Hughes Interrogatories, No. 13).

The three troopers then searched his car, Plaintiff Rodwell avers, going through the front and rear seats, glove compartment, wheel wells, engine compartment and trunk.  Nothing was found.  He says that Trooper Hughes then returned to the cruiser angry and frustrated, told him that he was going to lock him up and said they were just waiting for the tow truck to take his car to the barracks.  (Rodwell Responses to Hughes Interrogatories, No. 14, 16).

Plaintiff Rodwell claims that after the search the troopers with the dog left and, once the tow truck arrived, Trooper Hughes said that he was not going to lock him up after all.  He said he then had to pay the tow truck operator $80 before he could go on his way, some three hours after the initial stop.  (Rodwell Responses to Hughes Interrogatories, No. 18).

Trooper Hughes' recollection of the stop is quite different from that of Plaintiff Rodwell.  Trooper Hughes recalls the stop and affirmatively stated that no dog was deployed to scan the car and that there was no search.  He also testified that he never asked for consent to search Plaintiff Rodwell's car and that, inasmuch as Plaintiff Rodwell's driver's license was suspended, he could have arrested him and searched the car without consent.

(Hughes Deposition, p. 208-213).

The Court finds that the facts alleged by Plaintiff Rodwell, and the inferences that reasonably can be drawn from those facts, assert violations of his constitutional rights under the Fourth and Fourteenth Amendments.  Included among the salient facts alleged by Plaintiff Rodwell is the issue of the justification for the stop, *i.e.*, if the stop was "not really" for speeding, then the basis for it is unclear.  And, this unclear basis for the stop exists against a backdrop of powerful circumstantial evidence of racial profiling in the form of statistics compiled by the Maryland State Police-- and the senior officer corps' conclusions based upon those statistics, *i.e.*, that "a remarkable deviation" in regard to the percentage of African-Americans stopped and searched existed in the JFK Barrack area--which shows, at least, discriminatory effect from the practices afoot in the JFK Barrack patrol area.  *See,* Part III.A. *supra.*

The Court is mindful, however, that a showing of discriminatory effect is insufficient to make out a case of Equal Protection violation.  "To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose."  *Chavez v. Illinois State Police*, 251 F.3d 612, 635-636 (7th Cir. 2001)(citations omitted).  Moreover, the term

"discriminatory purpose," in the context of Equal Protection analysis, implies more than intent as volition or intent as awareness of consequences. It implies, instead, that the course of action was selected, at least in part, because of its adverse effects on an identifiable group. *McCleskey v. Kemp,* 481 U.S. 279, 298 (1987).

That said, if plaintiff's version and evidence are believed, it is reasonable to draw the inference that there was no legitimate basis for the stop, and even that the basis for the stop was an application of an unlawful racial profile. The lack of a legitimate basis for the stop, coupled with the trooper's answer ("No, not really") to plaintiff's inquiry about "speeding," all in the context of statistics that (1) show discriminatory effect and (2) are admissible on the issue of discriminatory intent (*see, Chavez,* 251 F.3d at 647-648) and all of this evidence taken in the light most favorable to the plaintiff, as it must be in this analysis, supports a conclusion that discriminatory intent motivated the trooper. Furthermore, if Plaintiff Rodwell's version of events is fully credited, then Trooper Hughes' credibility regarding all issues raised by the suit--including racial profiling--is effectively impeached, inasmuch as their versions of events, including the issue over whether any search even took place, is so greatly at odds. In sum, the Court recognizes that

there is no direct evidence of race-based motivation in regard to this stop--unlike some of the cases referenced below, there is no claim that the involved troopers made race-based statements. Nonetheless, it is the Court's judgment that the facts alleged above, *i.e.* the statistical evidence plus the arguable absence of any legitimate justification for the stop, is sufficient to satisfy the first prong of the *Saucier* inquiry, if barely so.

Turning to the second prong of the *Saucier* inquiry, the Court finds that there is a history of legal action and corresponding court-directed and agency-sponsored remedial action specifically directed to the "racial profiling" issues in this case of which none of the involved troopers reasonably could be unaware, and the Court concludes that no reasonable trooper in the place of the defendants could be unaware of the constitutional rights at issue in the context of this case.[5]  Further, the Court is comfortable assuming and finding that all troopers accused in these claims understood that to stop any motorist without probable cause or reasonable suspicion to believe they have committed an offense, or to conduct a search without probable cause or uncoerced consent or to simply prolong a seizure without justification is to violate that motorist's Fourth Amendment right to be free from unreasonable

---

[5]This finding as to the second prong of the *Saucier* analysis is applicable to all the stops and will not be replicated unnecessarily in those sections.

search and seizure.   Accordingly, the Court concludes that the constitutional rights at issue in this case are specifically identified and were clearly established at the time of the conduct. *See, Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).   Similarly situated and reasonable troopers would have understood that the conduct alleged here violated the Constitution.   The troopers involved in the Rodwell stop are not entitled to qualified immunity.

Furthermore, the Court finds that a reasonable jury, fully crediting Plaintiff Rodwell's version of events, could infer that the stop and the search were the results of deliberate race discrimination on the one hand and were unjustified under law on the other, thus making an award of summary judgment on the substantive constitutional claims inappropriate.   To reiterate the factual analysis set forth in respect to the qualified immunity claims, were the jury to conclude that there was no believable justification offered for the stop and search—and that Trooper Hughes was lying about it—a reasonable jury could conclude that the stop and search were race-based and illegitimate, particularly in light of the imbalance in the stop-and-search statistics referenced above.   By separate Order, summary judgment will be denied as to the constitutional claims by Plaintiff Rodwell against Trooper David Hughes.   On the other hand, there are no specific

24

indicia of any deliberate racial discrimination on the part of the troopers called to the scene after the stop.  Accordingly, summary judgment will be awarded to Troopers Donovan and Appleby in regard to the 14th Amendment equal protection claim.

### 2. *The Bailey Stop*

Verna Bailey was stopped by Trooper David Hughes.  Troopers Michael Hughes and Bernard Donovan also participated.

Ms. Bailey avers that she was driving at the speed limit, with her cruise control set at 65 mph and with all exterior equipment on the vehicle in working order, when an automobile pulled up very close behind her with high beams on.  She says that she changed lanes several times within several miles but that each time the automobile pulled up right behind her.  Becoming fearful, she says, she decided to pass a truck in front of her and to get directly in front of it so that the harassing auto behind her would be unable to pull behind her.

According to Ms. Bailey, upon passing the truck the auto behind her followed, engaging emergency lights and siren, and she pulled over immediately.  The trooper came to her car and told her that she was traveling 75 mph in 65 mph zone.  (Bailey Responses to MSP Interrogatories, No. 3).  Ms. Bailey avers that the trooper took only her driver's license, and not her registration, back to his cruiser, stating that he did not need her other paperwork.

(Bailey Deposition, p. 132).  She says that he returned to her car some minutes later, told her that he was going to give her tickets for speeding and for having her daughter asleep in the back of the car without a seatbelt.  Ms. Bailey claims that her daughter, in fact, was belted in.  He then asked, she avers, whether she had any marijuana, cocaine or weapons in the car.  When she replied in the negative, he purportedly stated that he didn't believe her, made a reference to her race, "suggested" that she looked like a drug dealer and told her that she should make it easy on herself because he already had called for a dog to sniff out drugs in her car.[6]

---

[6]The testimony of Ms. Bailey regarding her discourse with Trooper Hughes was at once salient and imprecise:
   Q. He referred to your race?
   A. Yes.
   Q. What word did he use to refer to your race?  What did he say?
   A. I just said I don't remember.
   Q. But you do remember he referred to your race?
   A. Yes, because I had it written, but I didn't write what he said.
   Q. Where did you have it written?
   A. It's in here, isn't it?
   Q. Well, there came a time after this incident where you wrote down what happened.
   A. When I wrote to the  – what was it?  The Annapolis Police Department or something because I wasn't going to pay the ticket, so I told them what happened.  And I remember that, but I don't remember what he said.
   Q. But you do remember --
   A. At the time, I did.
   Q. And what you remember is that he said something specifically about your race?
   A. Yes.

(continued...)

Ms. Bailey says the trooper requested that she sign a consent-to-search form, and she declined.  He then left and came back with another trooper who had arrived with a dog.  After the dog sniffed her car, Ms. Bailey was told to take her daughter and sit in the other cruiser while the troopers searched her car because the dog had detected marijuana.  In the other cruiser, a third trooper searched her pocketbook.  She then was given a breathalyzer test, she says.  (Bailey Response to MSP Interrogatories, No. 10, 21; Bailey Deposition, p. 188-190).

None of the troopers involved specifically recalls the stop and search, but the paperwork regarding it indicates that Ms. Bailey was stopped for speeding, that there was no K-9 scan of the car and that she consented to the search.  (Defense Exhib. Bates No. 04762).

The Court finds that the facts alleged by Plaintiff Bailey, and the inferences that reasonably can be drawn from those facts, assert violations of her constitutional rights under the Fourth and Fourteenth Amendments.  Ms. Bailey contends that she was not speeding when she first drew and held the attention of Trooper David Hughes and her version of events, most notably her allegation of the trooper's reference to race but also including the trooper's

---

[6](...continued)
(Bailey Deposition, p. 189-190).

purported indifference to her registration documents, could lead to a reasonable inference that the claim of speeding was a pretext for an unjustified stop and search based on a racial profile.   The Court again notes the statistical evidence referenced above and the background of memoranda and supervisory directives to desist from making race-based stops.   Moreover, the factual disagreement as to whether there was consent to search her vehicle must be resolved by a fact finder inasmuch as there has been no probable cause or other sufficient justification articulated to support the search. Finally, once again, were a jury to fully credit Ms. Bailey's version of events, then the paperwork generated by Trooper Hughes could be considered deleterious generally to the jury's view of the credibility of the involved troopers.   The Court finds that the troopers are not entitled to qualified immunity. *See, also, Part III.E.1*, discussion at p. 22-24, *supra*.

The facts alleged by Ms. Bailey articulated above also preclude an award of summary judgment to Trooper Hughes as to either constitutional claim.   Once again, however, there are no indicia of any deliberate racial discrimination on the part of the troopers called to the scene after the stop.   Accordingly, summary judgment will be awarded to Troopers Michael Hughes and Bernard Donovan in regard to the 14th Amendment equal protection claim.

### 3.  *The Williams Stop*

Johnston Williams, a black Liberian citizen and resident alien of the United States, was stopped by Trooper Billy White.  Mr. Williams had four passengers in his vehicle, three Liberian and one Guinean, all black.[7]

Mr. Williams claims that he was traveling at the speed limit with the flow of traffic in the middle lane of I-95 when Trooper White pulled in behind him and followed him for several miles.  The trooper eventually engaged his emergency lights, and Mr. Williams pulled over.  According to Mr. Williams, Trooper White advised him that he had been stopped for speeding and immediately asked him if he was Jamaican.  Mr. Williams claims that when he asked why that information was necessary Trooper White replied in a raised voice that he had a right to know, screamed at him and his passengers that he had the right to ask them whatever he pleased and told them that "you Jamaicans" were known to be involved in drug smuggling and gang-related activities.  Trooper White purportedly continued to refer to Mr. Williams and his passengers as drug-running Jamaicans and when Mr. Williams attempted to protest that he was

---

[7]Although the term "African-American" has become a term of art to indicate race and, in fact, is used by the plaintiffs in their motion papers in reference to the Williams party, Mr. Williams, at least, is not American.  It seems inappropriate, then, to refer to Mr. Williams as "African-American".  It is not clear whether any of his passengers, who are not parties to this case, were naturalized American citizens.

Liberian Trooper White cut him off and told him and his passengers that all foreigners of African descent were trouble makers and problem makers.  (Williams Response to White Interrogatories, No. 10).

Mr. Williams avers that Trooper White then opened his car door and pulled him from his car, shoved him against the car and kicked his legs apart, and placed one of his hands on his sidearm.  He claims that as Trooper White patted him down he told the other passengers that if they tried to get out of the car during the search he would shoot them and make it look like self-defense.  Mr. Williams alleges that Trooper White then divided the group and searched through the car, the engine compartment and the trunk--the search yielding no contraband.  The search purportedly was done without the consent of Mr. Williams.  (Williams Response to White Interrogatories, No. 15 and 16).

Mr. Williams claims that Trooper White, after checking his license, registration and immigration documents, returned to Mr. Williams' vehicle and gave him two tickets--one for speeding and one for refusing to sign a ticket.  Mr. Williams avers that when he and one of his passengers protested that Mr. Williams had not refused to sign anything, Trooper White told the passenger to shut up and told Mr. Williams to take the two tickets or risk being arrested.  (Williams Response to White Interrogatories, No. 18).

Trooper White avers that Mr. Williams was stopped because his vehicle was detected by laser unit traveling at 80 mph in a 65 mph zone. He denies following the vehicle for several miles. He avers that there was no search and that the occupants never left the vehicle. He denies making any racial or ethnic references. (White Affidavit, Defense Exhib. 05079-05083).

The Court finds that the conduct alleged by Mr. Williams, and the reasonable inferences that can be drawn therefrom, would be violations of his constitutional rights to equal protection and freedom from unreasonable search and seizure and that a reasonable police officer in Trooper White's position would have been aware that his conduct violated Plaintiff Williams' constitutional rights. Therefore Trooper White is not entitled to qualified immunity.

In regard to the substantive constitutional claims asserted, Mr. Williams contends that there was no valid reason for the stop and asserts that Trooper White engaged in ethnic slurs, an unjustified non-consensual search of his person and his vehicle, and deadly threats to his passengers. The facts alleged by Mr. Williams, if fully credited, would give rise to a reasonable inference that Trooper White's conduct was race/national origin based and that the purported search of Mr. Williams and his vehicle were in violation of Mr. Williams' constitutional rights pursuant

31

to the 4th and 14th Amendments.   Moreover, if Mr. Williams' version of events is fully credited, the diametrically variant statement of facts presented by Trooper White would impeach Trooper White's credibility generally.   By separate Order, summary judgment will be denied as to the constitutional claims of Plaintiff Williams.

### 4.   *The Berry Stop*

William Berry was stopped by Trooper Michael Hughes.   Mr. Berry avers that Trooper Hughes pulled up beside him and looked into his vehicle before dropping back and turning on his emergency lights.   The trooper then asked for his license and registration and, when he was unable to retrieve it immediately from his glove compartment, the trooper asked whether he possessed any weapons or drugs and told Mr. Berry to exit the vehicle.   He asked whether Mr. Berry had been drinking.   According to Mr. Berry, Trooper Hughes then went to his cruiser and when he returned he asked Mr. Berry for consent to search his vehicle.   Mr. Berry claims that he asked what would happen if he declined and Trooper Hughes purportedly told him that he would arrest him for obstruction of justice.   Mr. Berry then consented to a search of the vehicle, and the search was conducted.   No contraband was found.   Mr. Berry said he then was issued a ticket for failing to display his vehicle registration on demand.   (Berry Responses to MSP Interrogatories, No. 3).

Trooper Hughes has little recollection of the stop and assumes

there was no search because there is no paperwork indicating one. He states affirmatively, however, that he never told anyone that he/she would be arrested for obstruction of justice if he/she did not consent to a search.   (Hughes Deposition, Bates No. 02368).

The factors to which Mr. Berry points as evidence that the stop and search were motivated by race include Trooper Hughes pulling beside him to ascertain his race before making the stop and the fact that there was no articulated reason for the stop, inasmuch as the ticket issued to him was for conduct that occurred after the stop (failure to display registration on demand).   This Court, however, finds compelling the reasoning articulated in *U.S. v. Duque-Nava,* 315 F. Supp. 2d 1144, 1161 (D. Kan. 2004), and *U.S. v. Mesa-Roche,* 288 F. Supp. 2d 1172, 1192-93 (D. Kan. 2003), regarding the reasonableness, from a personal safety standpoint, of police officers acting to determine the number of a vehicle's occupants before making a stop and the refusal to find that such police action generates an inference of racial motivation for a stop sufficient to satisfy the intent prong of the equal protection analysis.   Moreover, in respect to the issue of the citations issued to Plaintiff Berry, the records of the District Court of Maryland clearly show that, in addition to the citation for failure to exhibit registration on demand, Mr. Berry also was charged with and found guilty of driving without current tags, a violation which

could be ascertained prior to the stop by a following trooper. (Defense Exhib. Bates No. 04779).  Accordingly, the Court finds that there is no threshold showing of discriminatory intent on the part of Trooper Michael Hughes in regard to this stop and, by separate Order, summary judgment will be awarded to Trooper Hughes in respect to Plaintiff Berry's equal protection claim against him. On the other hand, were Mr. Berry's version of events to be fully credited, that version would support a finding of an unlawfully coerced consent to search in violation of the Fourth Amendment and summary judgment will be denied as to that claim.[8]

### 5.  *The Taylor Stop*

Yancey and Aleisha Taylor were stopped by Trooper David Hughes.  The Taylors allege that they were not speeding and that their vehicle was in complete working order with up-to-date registration.  They claim that Trooper Hughes pulled up beside them and looked into their vehicle and then, when Mr. Taylor pulled onto the exit ramp for the Maryland House rest stop, Trooper Hughes followed and pulled them over.  Mr. Taylor says that when he asked Trooper Hughes why he was stopped, the trooper asked in turn why

---

[8]Qualified immunity is not at issue in regard to the search, inasmuch as Trooper Hughes denies that any search occurred.  Even were it at issue, it is clear that a search pursuant to coerced consent is a constitutional violation and that a reasonable trooper would have been aware that it was a constitutional violation.

Mr. Taylor was running from him.  Trooper Hughes then told him he was speeding and, when he turned to his wife and she indicated that they were not speeding, Trooper Hughes purportedly said something to the  effect of "That's what they all say."  According to Mr. Taylor, Trooper Hughes then ordered him to wait in his police cruiser.  (Yancey Taylor Response to MSP Interrogatories, No. 3, 24).

Mr. Taylor claims that while he was alone in the police cruiser, Trooper Hughes shined his flashlight into the Taylor vehicle, spotted a medicine bottle and asked whether there were any drugs or weapons in the vehicle.  During the stop, Trooper Hughes also purportedly asked the Taylors numerous questions about where they were going and whether Mr. Taylor had any outstanding warrants.  He also asked for and received permission to search the car but conducted no search, according to Mr. Taylor.  The Taylors claim that a second trooper, now identified as Trooper Steven Dulski, arrived.  During the conversation between the troopers and Mr. Taylor, Trooper Dulski purportedly asked Mr. Taylor if he was nervous.   Ultimately,  after  checking  without  success  for outstanding warrants for Mr. Taylor, Trooper Hughes sent the Taylors on their way with a written warning.  (Yancey Taylor Response to MSP Interrogatories, No.  24).

Again relying upon the rationale articulated in *Duque-Nava* and

*Mesa-Roche, supra,* the Court finds the purported act of Trooper Hughes wherein he pulled aside the Taylor vehicle and looked at the occupants prior to stopping the vehicle to be an insufficient indicator of discriminatory intent in support of the equal protection claim.   Moreover, there is no other significant indicator of such intent in the facts related by the plaintiffs as to either Trooper Hughes or Dulski.   Accordingly, by separate Order, summary judgment will be entered in favor of Defendants David Hughes and Steven Dulski in respect to the equal protection claims of Yancey and Aleisha Taylor.

In regard to the 4th Amendment claims against the troopers, it must be noted, first, that the troopers admit to no recall of the stop.   However, even if full credit is given to the facts related by the Taylors--that they pulled away onto a ramp shortly after a contact with a trooper, were stopped purportedly for speeding and were given a warning for speeding--those facts do not cut against a finding that troopers in the position of Hughes and Dulski could have a good faith reasonable belief that their conduct had a legitimate basis and that nothing that they did constitutes a 4th Amendment violation.   Accordingly, the Court finds that Troopers Hughes and Dulski are entitled to qualified immunity in respect to the 4th Amendment claims asserted by Yancey and Aleisha Taylor, and summary judgment will be awarded by separate Order.

### 6.   The Jeffries-Means Stop

Kenneth Jeffries and John Means were stopped by Trooper David Hughes.   Trooper Paul Quill later assisted.

Mr. Means, the driver, avers that they were traveling in a cluster of traffic in the far left lane at between 65 mph and 75 mph, approximately two car lengths behind the vehicle in front of them, when they were pulled over by Trooper Hughes.   He told them that they were pulled over for following too closely.   Mr. Means claims that they were the only black motorists amid a group of white motorists. (Means Response to MSP Interrogatories, No. 24).

According to Mr. Means, Trooper Hughes examined the identification of both men, and then separated them, with Mr. Jeffries remaining in their vehicle and Mr. Means taking a seat in the police cruiser.   Mr. Means says they were questioned separately about drugs and drug trafficking.   Trooper Hughes then purportedly stated that he was going to search their vehicle.   Trooper Hughes allegedly said that if they did not consent to the search he would obtain a court order and keep them there for several hours while he did so.   Mr. Means then consented to the search.   Trooper Hughes waited for Trooper Quill to arrive, and when he did Trooper Hughes searched the vehicle thoroughly.   Mr. Means avers that the stop took approximately two hours, after which he and Mr. Jeffries were sent on their way with a written warning for following too closely.

*Id.*

The only indicium of racial profiling asserted by the plaintiffs is that they were the only African-Americans amid a cluster of white motorists. The plaintiffs concede that they were traveling at or above the 65 mph speed limit only two car lengths behind the vehicle in front of them and the Court finds that a reasonable police officer in Trooper Hughes' position could have believed that he had a legitimate reason to stop the vehicle. Accordingly, the Court finds that Trooper Hughes is entitled to qualified immunity in regard to the stop. Likewise, there is no indicator of racial profiling elsewhere in the plaintiffs' version of the facts. Accordingly, an Order will be entered separately awarding summary judgment in favor of Troopers Hughes and Quill as to the equal protection claim brought by the plaintiffs. However, fully crediting plaintiffs' version of events, the Court finds that the alleged conduct of coercing the consent to search is a 4th Amendment violation of which Trooper Hughes should have been aware and that he, therefore, is not entitled to qualified immunity on the 4th Amendment claim nor to summary judgment on that substantive claim. On the other hand, there is no evidence that Trooper Quill took part in making the decision to search, in obtaining consent for the search or in conducting the search other than in providing security for Trooper Hughes during the search. Accordingly, the

Court finds the Trooper Quill is entitled to qualified immunity in regard to the 4th Amendment claim, and it will be so ordered.

### F. Conclusion

For the foregoing reasons, an Order will be entered separately granting in part and denying in part defendants' motion for summary judgment.

September 29, 2006
Date

James K. Bredar
United States Magistrate Judge